**E-Filed 1/16/07**

NOT FOR CITATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| EDUARDO CECENA, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>ALLSTATE INSURANCE CO., et al.,<br><br>  Defendants. | Case Number C 05-3178 JF (HRL)<br><br>ORDER[1] GRANTING IN PART AND DENYING IN PART ALLSTATE'S MOTION FOR SUMMARY JUDGMENT<br><br>[re: doc. No. 74] |

Defendant Allstate Insurance Company ("Allstate") seeks summary judgment or partial summary judgment with respect to the remaining claims set forth in the Second Amended Complaint ("SAC") filed by Plaintiffs Eduardo and Maria Cecena ("the Cecenas"). The hearing on the motion initially was set for December 8, 2006, but was continued for approximately one month to accommodate the Cecenas' request for further discovery pursuant to Federal Rule of Civil Procedure 56(f). The Court has considered all of the briefing submitted by the parties, including the supplemental briefs submitted on January 8, 2007, as well as the oral arguments

---

[1] This disposition is not designated for publication and may not be cited.

presented at the hearing on January 12, 2007. For the reasons discussed below, the motion will be granted in part and denied in part.

## I. BACKGROUND

This is an insurance bad faith case arising out of events following damage to the Cecenas' home as the result of a fire. Eduardo and Maria Cecena, an elderly couple who speak primarily Spanish, own a home in Hollister, California. Eduardo is a retired contractor. In 1999, the Cecenas refinanced their home through CoreWest Bank ("CoreWest"), at which time CoreWest advised them that they could receive a year of free homeowner's insurance if they switched to Allstate. According to Eduardo, the Cecenas never met with an Allstate agent or reviewed any disclosures or made any choices as to what type of coverage they wanted. It appears that CoreWest simply acquired the policy for the Cecenas, and that they renewed it thereafter.

The Cecenas' home suffered serious fire damage in December 2003. They reported the claim to Allstate, which appointed Hubert Chappell ("Chappell") to adjust the structural loss, Catherine Smith ("Smith") to adjust personal property items and Amy Patton ("Patton") to adjust the Cecenas' claim for additional living expenses ("ALE").

Structural Loss: Allstate introduces evidence that the Cecenas initially informed Chappell that their son's brother-in-law, Mike Collins ("Collins"), was going to repair the structural damage to the home. Chappell asked for a repair estimate in December 2003, but such estimate never was provided. Chappell arranged for a general contractor, DMC Construction ("DMC"), to provide a repair estimate in January 2004. As of March 2004 Chappell still had not received a repair estimate from the Cecenas, so he prepared his own estimate, using the materials provided by DMC. Chappell then went on medical leave, and a new adjuster named Steve Bryan ("Bryan") was assigned to the case. Bryan met with the Cecenas in March 2004 to discuss Chappell's repair estimate. At that time the Cecenas had not yet made a decision regarding a contractor – apparently Collins no longer was available – and were considering razing the house and building a new one rather than repairing the damage caused by the fire. Bryan completed a new repair estimate for $142,578.68 in April 2004, at which time he advanced the sum of $20,000 to the Cecenas. Two weeks later, Allstate paid the balance of Bryan's estimate, less

depreciation. At the Cecenas' request, Bryan reissued the structure payment in late April 2004, naming a new mortgagee.

The Cecenas still had not hired a contractor, and they asked Allstate to recommend one. Allstate recommended DMC, the firm that had done the original repair estimate. DMC stated that it could do the repairs for $143,290.01, which was $713.33 more than Bryan's estimate. Allstate immediately issued a check to the Cecenas for the $713.33 difference. The Cecenas did not apply for a building permit until September 2004 (nine months after the fire and five months after receiving the structural payment from Allstate) and did not enter into a construction contract with DMC until December 2004 (approximately one year after the fire and eight months after receiving the structural payment from Allstate). They did not contract for repair of their home, but rather for construction of a new home. The new home was completed in June 2005.

The Cecenas assert that unidentified "Allstate's representatives" said that Allstate would "take care of them" and that they would be back in their home within four months. The Cecenas believe that Allstate lied to them to discourage them from hiring a public adjuster to help with obtaining insurance benefits. The Cecenas complain that Allstate did not provide a structural repair estimate until April 2004, that Allstate provided a later estimate in June 2004, and that these estimates did not include the cost of code upgrades. The Cecenas do not address the facts that Allstate was not contractually obligated to provide a repair estimate, that they did not provide any estimates, and that their policy did not contain coverage for code upgrades. At the time in question, Allstate did offer such coverage for *up to 10% of the amount of the structural coverage* to comply with local building codes when repairing a loss. After the code issue arose, Allstate agreed to add that coverage to the Cecenas' policy retroactively based upon the Cecenas' representation that their agent, Michael Romero ("Romero"), had failed to offer the coverage when they purchased the policy. The evidence now shows that the Cecenas never talked to Romero about any aspect of their coverage. Because the Cecenas' home was built in the 1970s, and was so far out of date, the added coverage of $16,467 paid by Allstate fell far short of the $80,000 in code upgrades that were needed. The Cecenas take the position that Allstate nonetheless was obligated to pay the full $80,000.

The Cecenas also complain that Allstate failed to pay other costs, such as approximately $5,000 for asbestos removal, $1,500 for trimming heat-damaged trees, and the full amount of architectural fees. The Cecenas assert that they spent $383,000 replacing their home, and that they were required to reduce the size of the home because Allstate would not make full payment. It is unclear why the Cecenas elected to replace their home rather than contract with DMC for repairs, the cost of which would have been fully covered by the policy.

<u>Personal Property</u>: Allstate provided the Cecenas a $2,500 advance immediately after the fire, followed by additional advances of $10,000 and $5,000. The Cecenas did not provide an inventory of destroyed contents of the home until June 2004, six months after the fire, despite several requests from Allstate. Allstate paid the full replacement value of the claimed contents, even though the Cecenas did not provide proof that they had replaced anything. The Cecenas nonetheless assert that Allstate improperly used sale prices and excluded shipping charges when valuing their personal property.

<u>Additional Living Expenses</u>: The Cecenas' policy provides ALE coverage for additional living expenses in the event the home becomes uninhabitable. The policy provides for ALE expenses for the shortest of: the time required to repair or replace the property, using due diligence; or the shortest time for the insured to permanently relocate; or twelve months. Patton, the adjuster assigned to this portion of the claim, states that she informed the Cecenas of their options under this provision, and that the Cecenas elected to stay with their son and negotiated a cash out of $500 per month. Allstate paid a full twelve months of ALE benefits at this rate.

The Cecenas assert that Patton did not offer them rental housing in a comparable home, to which they were entitled, but offered only a "motel with kitchenette." The Cecenas state that they refused to live in a motel, and for that reason chose to sleep on a fold-out couch at their son's home, even though such an arrangement was inconvenient. They believe that Allstate cheated them by failing to inform them that they could have lived in a comparable rental home at a cost of $2,000 per month.

The operative SAC alleges claims for: (1) breach of insurance policy; (2) bad faith policy sale; (3) bad faith breach of contract; (4) negligence; (5) unlawful business practices; (6)

4

violation of California Insurance Code §§ 10102 and 10103; and (7) violation of California Insurance Code §§ 790.02 and 790.03.  On December 8, 2006, the Court dismissed the second, fifth, sixth and seventh claims without leave to amend.  Allstate seeks summary judgment or partial summary judgment of the remaining claims for breach of insurance policy (first claim), bad faith (third claim) and negligence (fourth claim).

## II. LEGAL STANDARD

A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of informing the Court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party meets this initial burden, the burden shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  A genuine issue for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor.  *Anderson*, 477 U.S. 242, 248-49; *Barlow v. Ground*, 943 F. 2d 1132, 1134-36 (9th Cir. 1991).

## III. DISCUSSION

As an initial matter, the Court notes that Allstate objects to the supplemental evidence and arguments that the Cecenas have submitted in opposition to this motion on the ground that the subject evidence and arguments do not relate to the discovery disputes that led the Court to grant the Cecenas' request for a continuance of the hearing date.  Allstate argues that the Cecenas simply are taking the opportunity to provide additional, unauthorized evidence and argument in opposition to the motion.  While Allstate's objection is well-taken, the Court in the exercise of its discretion will consider the additional evidence and arguments submitted by the Cecenas.  As discussed herein, Allstate's motion is dispositive of a number of aspects of the Cecenas' claims,

and the Court wishes to afford the Cecenas every reasonable opportunity to oppose the motion on the merits.

Allstate additionally makes a number of evidentiary objections based upon lack of authentication. These objections are well-taken and are sustained. However, the Court notes that its analysis of the motion would be the same even if the documents in question were considered.

### A. First Claim For Breach Of Insurance Policy

#### 1. Structural Loss

It is undisputed that the Allstate policy provided coverage for the repairs of structural damage to the Cecenas' home. Allstate introduces evidence that the Cecenas failed to provide a repair estimate for several months following the fire, and that Allstate eventually hired a general contractor, DMC, to prepare a repair estimate so that Allstate could adjust the loss. Allstate used DMC's figures to arrive at a repair estimate of $142,578.68, less depreciation. Allstate paid the Cecenas this amount. The Cecenas subsequently hired DMC to do the repairs, at which time DMC submitted a repair bid to the Cecenas of $143,290.01, which was $713.33 more than Allstate's original repair estimate. Allstate immediately paid the Cecenas the $713.33 difference.

The Cecenas argue that Allstate underpaid the structural loss, submitting a new contractor's estimate that repair of the home would have cost $191,205.58, $47,913.57 more than the amount paid by Allstate. It is undisputed, however, that this estimate was not provided to Allstate at the time of the adjustment, and that Allstate paid in full the *actual bid* of DMC, the contractor that the Cecenas hired to repair their home. As noted above, the Cecenas ultimately decided to have the home razed and rebuilt completely, which cost much more than repair of the home would have cost. However, it is undisputed that the Allstate policy provided the Cecenas with coverage for *repair* of their home, not a new home. Accordingly, based upon all of the information Allstate had before it at the time it adjusted the Cecenas' claim, Allstate reasonably concluded that the covered cost of repairing the home was the $143,290.01 bid submitted by DMC.

The Cecenas point to evidence that Mike Mosebach of DMC felt that Allstate's repair estimate was too low. However, it is undisputed that DMC ultimately offered a bid for the repair

6

job that was only $713.33 more than Allstate's repair estimate. That bid obligated DMC to perform the repairs for $143,290.01, and there is no evidence that DMC would not have performed the repairs for that bid price had the Cecenas opted for repair rather than replacement of their home. Accordingly, no reasonable finder of fact could conclude that Allstate did not fulfill its contractual obligations to pay the cost of repairing the home.

The Cecenas assert that Allstate was required to pay actual engineering fees incurred. The Cecenas assert that Allstate refused to pay an engineering bill of $10,967.69 in March 2005. However, Allstate points to evidence that it was not presented with an engineering bill until January 26, 2006, nearly a year after this lawsuit was filed. In any event, it is undisputed that Allstate ultimately paid the bill even though the engineering fees related to design of the Cecenas' *new* home – which Allstate was not obligated to cover – rather than repair of damages to the Cecenas' home. The Cecenas' assert that Allstate improperly refused to pay a portion of the bill representing "overhead and profit." However, it does not appear from the policy language that Allstate was obligated to pay *any* engineering fees for design of a new home; accordingly, no reasonable trier of fact could conclude that failure to pay the portion of the engineering bill representing "overhead and profit" constituted a breach of the policy. To the contrary, it appears that the Cecenas received a windfall of approximately $11,000 as a result of Allstate's payment of the engineering fees.

The Cecenas argue that Allstate failed to pay $5,493.98 in asbestos abatement costs even though such costs are provided for in the policy. However, it is undisputed that the Cecenas did not submit any invoice or request regarding asbestos abatement at the time the claim was adjusted. Accordingly, no reasonable finder of fact could conclude that Allstate breached the policy by failing to pay asbestos expenses.

The Cecenas assert that Allstate failed to pay $1,500 in fire damage to trees on their property, even though tree damage is covered by the policy. There is no evidence that the Cecenas submitted a claim for tree damage at the time the claim was adjusted. Moreover, Allstate cites to the deposition testimony of Eduardo and Andy Cecena stating that the trees in question were damaged during construction of the new home, not during the fire. See Eduardo

Depo 84:21 - 85:2; Andy Depo 154:1 - 155:3. Accordingly, no reasonable trier of fact could conclude that Allstate breached the policy by failing to pay tree damage.

It is unclear from the Cecenas' briefing, but it appears that they may be asserting a claim that Allstate failed to pay the $80,000 in code upgrades that were needed to update their home. It is undisputed that the policy as it existed at the time of the fire did not cover code upgrades. It further is undisputed that Allstate agreed to add that coverage to the Cecenas' policy retroactively based upon the Cecenas' contention that their agent, Michael Romero ("Romero"), had failed to offer the coverage when they purchased the policy. Allstate paid the full amount of the code coverage, but such coverage provided for *up to 10% of the amount of the structural coverage* to comply with local building codes when repairing a loss. The $16,467 paid by Allstate for code upgrades fell far short of the $80,000 in code upgrades that were needed. However, the Cecenas have not pointed to any policy provision obligating Allstate to pay more than this amount. Accordingly, no reasonable trier of fact could conclude that Allstate's failure to pay the full $80,000 in code upgrades was a breach of the policy.

### 2. Personal Property

Under the policy, the Cecenas were entitled to the "actual cash value" of the contents of the home that were lost in the fire, less depreciation. In the event the Cecenas actually replaced any of the contents, they could recover the depreciation for those items. Allstate paid the Cecenas for all claimed personal property, less depreciation of $12,533.63. When the Cecenas subsequently requested that depreciation not be withheld, Allstate agreed to pay them the $12,533.63 even though there was no evidence the Cecenas actually had replaced any of the items.

The Cecenas claim that Allstate improperly used sale prices to value at least some personal items, and as a result underpaid them $250. The Cecenas also claim that Allstate improperly excluded shipping charges from its actual cash value calculation, and as a result underpaid them hundreds of dollars. Allstate does not include shipping charges in its calculation of actual cash value, and the Cecenas point to no policy provision or other authority obligating Allstate to include shipping charges in calculating actual cash value. Moreover, Allstate points

8

out that even if shipping charges properly should be included in the actual cash value calculation, Allstate actually *overpaid* the Cecenas more than $12,000, because Allstate did not withhold the depreciation on the Cecenas' personal items even though the Cecenas did not offer any evidence that they actually replaced their personal items. It is clear from the record that any possible underpayment resulting from the use of sale items and failure to include shipping charges falls far short of the $12,000 in depreciation costs that Allstate returned to the Cecenas. Accordingly, no reasonable trier of fact could conclude that Allstate breached the policy with respect to coverage of the Cecenas' personal property.

### 3. Additional Living Expenses

The policy required Allstate to "pay the reasonable increase in living expenses necessary to maintain [the Cecenas'] normal standard of living" when their home became uninhabitable. The Cecenas assert that the adjuster responsible for this portion of their claim, Patton, gave them the choice between living in a motel room with a kitchenette or living with a relative and receiving a monthly cash payment. The Cecenas agreed to live with their son and to take a monthly cash payment of $500. Allstate paid twelve months of ALE benefits at the $500 rate. Clearly, then, Allstate cannot be said to have breached the provision requiring it to pay ALE expenses.

The Cecenas assert that Allstate breached its *disclosure* obligations by failing to inform them that they had other options under the ALE provision, namely, the option to live in a comparable home for the year in question rather than a motel room. The Cecenas assert that a comparable home would have cost approximately $2,000 per month to rent, and that had Allstate disclosed this option, they would have chosen it rather than lived on a sofa-bed in their son's home for the year in question.[2]

---

[2] There is a discrepancy between the Cecenas' deposition testimony and declaration statements on this point. In their depositions, the Cecenas testified that they never considered living anywhere other than with their son following the fire. In their declarations, they stated for the first time that they would have chosen to live in comparable rental housing had it been offered. For purposes of summary judgment, the Court concludes that the declaration statements are sufficient to create a triable issue of material fact on this point, notwithstanding the apparent

While Allstate correctly points out that the Cecenas do not introduce evidence that rental of a comparable home would have been $2,000 per month, the Court takes judicial notice of housing rental market in general and concludes that rental of a home comparable to the Cecenas' four-bedroom home would have been more than $500 per month. How much more would be easy enough to quantify. The real question presented by the Cecenas' argument is whether Allstate's alleged failure to disclose the rental home option gives rise to a viable claim for breach of the insurance policy. The ALE provision provides for *reimbursement* of additional living expenses incurred by the insureds. Here, the Cecenas are attempting to recover for expenses that they did not actually incur on the theory that they might have incurred such expenses had Allstate fully disclosed their housing options. Allstate argues that the Cecenas in essence are attempting to recover compensation for the inconvenience they suffered, and that such recovery is not available on a breach of contract theory. The Cecenas argue that they are trying to recover damages arising from Allstate's breach of its disclosure obligations, citing California's Code of Regulations for the proposition that "[e]very insurer shall disclose to a first party claimant or beneficiary, all benefits, coverage, time limits or other provisions of any insurance policy issued by that insurer that may apply to the claim presented by the claimant." 10 Cal. Admin. Code § 2695.4(a).

While the Court concludes that Allstate did not breach the express terms of the ALE provision itself, in that Allstate paid the $500 negotiated monthly increase in expenses for the full year provided by the ALE provision, it also concludes that the record is less clear as to whether Allstate breached its obligations to disclose all of the benefits available to the Cecenas under the ALE provision. The parties' briefs do not focus on the effect of any such breach on the part of Allstate, and the Court has not discovered any authority directly on point. Accordingly, the Court will deny Allstate's motion with respect to the ALE provision without prejudice to a renewed motion directed toward what the Cecenas now have made clear is their true theory of liability, that is, Allstate's alleged failure to disclose all of the benefits available under the policy's ALE

---

discrepancy with the deposition testimony.

provision.

**B.      Third Claim For Bad Faith**

An insurer is liable for breach of the implied covenant of good faith and fair dealing if it acts unreasonably in denying coverage. *Lunsford v. American Guarantee & Liability Insurance Co.*, 18 F.3d 653, 656 (9th Cir. 1994); *Tomaselli v. Transamerica Insurance Co.*, 25 Cal.App.4th 1269, 1280-81 (1994). However, an erroneous denial of benefits does not expose an insurer to tort liability. *Id.* at 1280-81. While the reasonableness of an insurer's claims handling is a question of fact, *Carlton v. St. Paul Mercury Insurance Co.*, 30 Cal.App.4th 1450, 1456 (1994), a court may conclude as a matter of law that an insurer's denial of a claim was not unreasonable so long there existed a genuine issue as to the insurer's liability, *Lunsford*, 18 F.3d at 656.

As discussed above, the potentially viable claim for breach of the policy that the Cecenas' may have is a claim based upon failure to disclose related to the ALE provision. To the extent that claim turns out to be viable, the Cecenas likewise would have a viable claim for bad faith. There is a triable issue of material fact as to whether Patton informed the Cecenas of their right to maintain their "normal standard of living," that is, to live in a comparable home at Allstate's expense. While Patton's failure fully to inform the Cecenas of their rights – if such failure occurred – could have been the result of error, it also could have been a deliberate attempt to underpay ALE expenses. Accordingly, unless and until Allstate prevails on a renewed motion for summary judgment with respect to the claim for failure to disclose ALE options, the Court will deny Allstate's motion for summary judgment on the Cecenas' corresponding bad faith claim.

**C.      Fourth Claim For Negligence**

"[N]egligence is not among the theories of recovery generally available against insurers." *Sanchez v. Lindsey Morden Claims Services, Inc.*, 72 Cal.App.4th 249, 254 (1999). The Cecenas' theory seems to be that Allstate had a duty to provide them with "adequate" insurance. However, the record is clear that the Cecenas never spoke with Michael Romero, the Allstate representative who did the paperwork on their policy, or with any other Allstate representative. The Cecenas did not request any particular level of insurance coverage or any particular features.

They simply accepted the policy procured for them by CoreWest and renewed it thereafter. It is undisputed that the coverage provided replacement cost of the home, replacement cost of personal property, additional living expenses and other coverage. Under these circumstances, no reasonable trier of fact could conclude that Allstate breached a duty of care to provide adequate coverage, even if such a duty existed.

During the hearing, counsel for the Cecenas made clear that the negligence claim in part is based upon Allstate's alleged failure to provide coverage that would have paid for the full $80,000 in code upgrades required when their home was rebuilt. When the Court pointed out that the record reflected that Allstate simply did not offer such coverage at the time in question, counsel for the Cecenas clarified that the Cecenas are contending that Allstate had a duty to direct the Cecenas to *other* insurers in the market who would have offered such coverage, and that Allstate's failure to do so constituted negligence. The Cecenas have not cited to any authority that would support this theory of negligence liability.

## IV. ORDER

Allstate's motion for summary judgment or partial summary judgment is GRANTED IN PART with respect to all claims except the claims for breach of contract and bad faith based upon the alleged failure to disclose in connection with ALE benefits, as to which the motion is DENIED IN PART WITHOUT PREJUDICE.

DATED: 1/16/07

_____
JEREMY FOGEL
United States District Judge

This Order was served on the following persons:

Michael A. Barnes     mbarnes@sonnenschein.com, msaplala@sonnenschein.com

Sonia Renee Martin    smartin@sonnenschein.com, clakes@sonnenschein.com; ; msaplala@sonnenschein.com

John A. Shepardson    johnshepardson@hotmail.com

Jessica Lou Woelfel   jwoelfel@sonnenschein.com, ddonner@sonnenschein.com

Case No. C 05-3178 JF (HRL)
ORDER GRANTING IN PART AND DENYING IN PART ALLSTATE'S MOTION FOR SUMMARY JUDGMENT
(JFLC2)